2003-NMCA-012

62 P.3d 270

**SOUTHWEST RESEARCH AND INFORMATION CENTER, Dara Mark, and Wayne Gibson, Appellants,**

v.

**STATE of New Mexico, New Mexico Environment Department, and Peter Maggiore, in his official capacity as Secretary of the New Mexico Environment Department, Appellees.**

No. 21,293.

Court of Appeals of New Mexico.

June 5, 2002.

Certiorari Granted, No. 27,578, Jan. 16, 2003.

Margot Steadman, Albuquerque, NM, Kevin M. Ward, Harding, Shultz & Downs, Denver, CO, for Appellants.

Susan M. McMichael, Special Assistant General Counsel, Assistant General Counsel, Paul R. Ritzma, Acting General Counsel, Deputy Secretary, New Mexico Environment Department, Santa Fe, NM, for Appellees.

*OPINION*

FRY, Judge.

{1} This case involves the permit for the Waste Isolation Pilot Project (WIPP), a facility for the storage of radioactive waste outside of Carlsbad, New Mexico. After a lengthy hearing process, the Secretary of the New Mexico Environment Department (Department) issued a final permit to the operators of the facility, or Permittees, the United States Department of Energy (DOE) and Westinghouse Waste Isolation Division (Westinghouse). One provision of the permit had undergone several permutations. The penultimate permutation was contained in an order, the text of which indicated that the Secretary intended to do something other than what he actually did in the language of the provision, at least when that language is read in accordance with strict rules of grammar and statutory construction. The Secretary then changed the provision to conform to his initial intent, and we must determine whether this final change in the language of the permit was a major modification of the permit for which a hearing was required under the New Mexico Hazardous Waste Act (the Act), NMSA 1978, §§ 74-4-1 to -14 (1977, as amended through 2001), or a minor modification for which no hearing was required. Under the unique and limited circumstances of this case, in which the Secretary's intent was clear in the order adopting the provision and the provision's language could be reasonably understood, in the context of how it was adopted, to accomplish what the Secretary intended, we hold that the modification was minor and did not require a hearing. We also determine that the Secretary, in his discretion, was not required to hold a hearing on the alleged ground that there was significant public interest in the issue. We initially determine several procedural issues arising out of the manner in which the issue was decided below and the appeal was taken. We hold that we have jurisdiction over the issues on appeal, and we affirm the Secretary's determination.

**FACTS AND PROCEDURAL POSTURE**

{2} The WIPP facility is designed for the underground storage of radioactive, or, more technically, transuranic (TRU) waste. This appeal concerns two different types of TRU waste: mixed TRU waste and non-mixed TRU waste. Mixed TRU waste is waste that is radioactive and also meets the definition of hazardous waste in the Act. The Department has the authority to regulate the storage and disposal of mixed TRU waste. 42 U.S.C. § 6926 (2002); State of New Mexico: Final Authorization of State Hazardous Waste Management Program, 55 Fed.Reg. 28,397 (July 11, 1990) (codified at 40 C.F.R. pt. 271); New Mexico: Decision on Final Authorization of State Hazardous Waste Management Program, 50 Fed.Reg. 1515 (January 11, 1985) (codified at 40 C.F.R. pt. 271). Non-mixed TRU waste is waste that is radioactive, but does not meet the definition of hazardous waste in the Act. The extent to which the Department can regulate non-mixed TRU waste has been the subject of considerable litigation and is not directly before us in this appeal, although questions surrounding it are part of the backdrop of facts. The Permittees took the position that regulation of non-mixed TRU waste is the exclusive province of the federal government.

{3} Facilities for the disposal of hazardous waste must receive a permit from the Department in order to operate in New Mexico. The permitting process for WIPP has been going on during most of the 1990s. We are concerned, however, with only those portions of the process that have occurred since 1998.

{4} On May 15, 1998, the Department issued a draft permit, which, in essence, proposed to permit storage of hazardous waste at WIPP, subject to a number of terms and conditions. Some of these conditions in-

volved a process referred to by the parties as "characterization" of waste. Characterization is a process applied to waste by the Permittees in order to determine the specific characteristics of the particular shipment of waste before it is disposed at WIPP. Thus, the characterization process allows the Permittees to determine whether particular waste is only radioactive (non-mixed), or is both radioactive and hazardous (mixed), and to identify the hazardous constituents in the waste. It allows for the screening of some types of hazardous waste that cannot be disposed at WIPP. The final permit adopted a specific process for characterization of waste that is quite elaborate.

{5} In the permit application, the Permittees' characterization plan represented that all waste, including non-mixed waste, would be managed and characterized as though it were mixed waste. Shortly after issuance of the May 1998 draft permit, however, DOE informed the Department that it intended to store radioactive waste at WIPP before the Department issued the hazardous waste permit. This and other considerations led the Department to issue a second draft permit in November 1998. This second draft permit contained the first version of the condition that is at the heart of this appeal. We refer to this as "Condition IV.B.2.b," or simply, "the condition." The original draft of the condition read as follows:

> *Specific prohibition*—the Permittees shall not dispose non-mixed TRU waste in any unit specified in this Module unless such waste is characterized in a manner identical to the requirements of the WAP specified in Permit Condition II.C.1.

(A WAP is a waste analysis plan). This provision appeared to subject non-mixed waste to Department regulation, something the Permittees claim is contrary to federal law.

{6} After the draft permit was published, the public was given an opportunity to comment on the permit. Once the many and voluminous comments were received, including those from Appellant Southwest Research and Information Center (Southwest Research), the Department scheduled hearings on the proposed permit, including a hearing on technical testimony that lasted from February 22 to March 26, 1999.

{7} While the permit process was going forward in New Mexico, the State was also seeking an injunction from the United States District Court for the District of Columbia to prevent the shipment of a particular stream of non-mixed waste from Los Alamos National Laboratory to WIPP. However, in an opinion dated March 22, 1999, the district court denied the injunction and held that the waste in question could be disposed at WIPP, even though the Department had not yet issued a final permit. *State ex rel. Madrid v. Richardson,* 39 F.Supp.2d 48, 53–54 (D.C.Cir. 1999).

{8} In June 1999, the parties submitted proposed findings of fact and conclusions of law to the hearing officer. At that time, the Department's proposal for the language of the condition was as follows:

> *Specific prohibition*—The Permittees shall not dispose non-mixed TRU waste in any Underground HWDU unless such waste is characterized in accordance with the requirements of the WAP specified in Permit Condition II.C.1. The Permittees shall not dispose TRU mixed waste in any Underground HWDU if the Underground HWDU contains non-mixed TRU waste not characterized in accordance with the requirements of the WAP.

The Department's proposal (1) changed "unit specified in this Module" to "Underground HWDU [Hazardous Waste Disposal Unit, also known as panel]," (2) changed "identical to" to "in accordance with," and (3) added the second sentence. The first change simply changed terminology, and the second change softened the language of the requirement. The purpose of the third change is disputed.

{9} On September 10, 1999, the hearing officer issued his report, which was over 100 pages long. The report included findings of fact, a narrative discussion, conclusions of law, and a recommended decision and proposed final order. In response to concerns by the Permittees that the language of the condition proposed by the Department would allow the Department to apply the requirements of the permit to waste placed at WIPP

before the effective date of the permit and thereby amount to ex post facto regulation, the hearing officer proposed modifying the permit so that it would read as follows:

Specific prohibition—After this Permit becomes effective, the Permittees shall not dispose non-mixed TRU waste in any Underground HWDU unless such waste is characterized in accordance with the requirements of the WAP specified in Permit Condition II.C.1. The Permittees shall not dispose TRU mixed waste in any Underground HWDU if the Underground HWDU contains non-mixed TRU waste not characterized in accordance with the requirements of the WAP.

This change added "after this permit becomes effective" to the version proposed by the Department.

{10} The Permittees were still concerned about application of the permit to pre-permit waste. In October 1999, the Secretary reopened the record for the limited purpose of allowing the parties to submit three pages of legal argument in response to the following question:

Does the prohibition regarding disposal of TRU mixed waste referenced in the second sentence of Permit Condition IV.B.2.[b], apply to waste disposed of prior to permit issuance?

{11} The Secretary issued his final order on October 27, 1999. He adopted all of the hearing officer's findings of fact and most of the conclusions of law without change. However, the Secretary modified the hearing officer's conclusions of law by adopting the following language for the condition:

Specific prohibition—After this permit becomes effective, (1) the Permittees shall not dispose non-mixed TRU waste in any underground HWDU unless such waste is characterized in accordance with the requirements of the WAP specified in Permit Condition II.C.1, and (2) The permittees shall not dispose TRU mixed waste in any underground HWDU if the underground HWDU contains non-mixed TRU waste not characterized in accordance with the requirements of the WAP.

In the final order, the Secretary said that he had adopted this language to alleviate the

Permittees' continued concerns about being "subject to enforcement because they have already disposed of waste not characterized in accordance with the WAP" and not being able "to dispose of additional waste in panel 1 after the HWA Permit becomes effective, because there is already waste in panel 1 not characterized in accordance with the WAP." In his narrative responding to these concerns, the Secretary said, "These concerns are misplaced. The terms of the HWA Permit only apply after the permit becomes effective." He then said he would amend the condition to "clarify that Permit Condition IV.B.2.b applies only after the permit becomes effective[,]" and thus he adopted the language in block form immediately above.

{12} DOE and Southwest Research both appealed this final order in Southwest Research & Information Center v. New Mexico Environment Department, No. 20,877 (Ct. App. filed Oct. 20, 2000). We refer to that appeal as Southwest Research I. We take judicial notice of our own records. State v. Powers, 111 N.M. 10, 12, 800 P.2d 1067, 1069 (Ct.App.1990), relying on State v. Turner, 81 N.M. 571, 576, 469 P.2d 720, 725 (Ct.App. 1970) (holding that this Court can take judicial notice of its own records). At the same time, DOE filed a case in the United States District Court for the District of New Mexico, United States v. New Mexico Environment Department, No. CV–99–1280 (D.N.M. filed Nov. 3, 1999), seeking similar relief from provisions of the permit it thought were contrary to federal law. On November 23, 1999, DOE filed a motion to stay Southwest Research I, so that the federal court could decide its case first. In its docketing statement, DOE specifically challenged the authority of the Department to impose the condition at issue in this case. Southwest Research's docketing statement argued, among other things, that the condition did not go far enough and that the permit should have been denied because the application did not provide complete and accurate information concerning the disposal of waste at WIPP before the permit was issued.

{13} Eventually, the Permittees and the Department stipulated to stay further proceedings in Southwest Research I and in the

federal case for a limited period of time so that DOE could submit to the Department certain proposed modifications of the final permit conditions, including a modification of the condition at issue in this appeal. Although Southwest Research objected to the stay, this Court granted the motion to stay further proceedings for a limited period of time. Ultimately, after the filing of the present appeal, all appeals in *Southwest Research I* were dismissed; DOE acceded to some Department jurisdiction over non-mixed waste and Southwest Research agreed to raise any issues it had with the permit in this appeal. Appellants raise only one narrow issue in this appeal, which is that relating to the modification of the one permit condition to which we now turn.

{14} DOE submitted its proposed modification to the Department on April 20, 2000. DOE proposed to amend Condition IV.B.2.b to read as follows:

*Specific prohibition*—After this Permit becomes effective, the Permittees shall not dispose non-mixed TRU waste in any Underground HWDU unless such waste is characterized in accordance with the requirements of the WAP specified in Permit Condition II.C.1. The Permittees shall not dispose TRU mixed waste in any Underground HWDU if the Underground HWDU contains non-mixed TRU waste which was disposed of after this permit became effective and was not characterized in accordance with the requirements of the WAP.

This change returned the condition to two sentences and added the language "which was disposed of after this permit became effective" to the second sentence. DOE's application for modification characterized the modification as a Class 1 permit modification pursuant to 20.4.1.900 NMAC (2000), which incorporated by reference 40 C.F.R. § 270.42(a)(1) (2001). On April 24, 2000, Southwest Research sent a letter to the Secretary, arguing that the proposed modification was not a Class 1 modification and, therefore, should not be approved.

{15} On April 25, 2000, John E. Kieling, the Department's acting manager of its Permits Management Program, sent a certified,

return receipt requested, letter to DOE and Westinghouse. The letter informed DOE and Westinghouse that Kieling had approved the proposed modification as a Class 1 modification. Kieling did not send a copy of the letter to Southwest Research.

{16} On May 2, 2000, Southwest Research filed a notice of appeal in this Court, attaching a copy of Kieling's letter. Southwest Research also moved for a stay of the effectiveness of the modification during the pendency of the appeal. On May 10, 2000, the Secretary sent a letter to Don Hancock of Southwest Research, informing him that the modification did not change the meaning of the condition as stated in the final permit. Therefore, in the Secretary's view, the modification was properly a Class 1 modification. The Department attached a copy of the Secretary's letter to its response to Southwest Research's motion to stay. This Court ultimately denied the motion to stay.

{17} On appeal, Southwest Research argues that the Secretary did not properly classify the modification of Condition IV. B.2.b as a minor modification under the Act, or as a Class 1 modification under the regulations adopted by the Department. Southwest Research argues that the condition, as stated in the final permit, prohibited the Permittees from storing mixed waste in Panel 1 because that panel already contained non-mixed waste that had not been characterized in accordance with the plan in the final permit. Thus, it argues that the subsequent modification was a major change because it allows the Permittees to store mixed waste in the panel containing pre-permit uncharacterized non-mixed waste. In the alternative, even if the modification was properly a minor, or Class 1, modification, Southwest Research argues that the Department should have held a public hearing on the modification because there is significant public interest in the modification.

{18} The Department makes several arguments in response. Initially, the Department argues that this Court lacks jurisdiction over this appeal because Kieling's letter was not the final agency action. Similarly, the Department contends that Southwest Research is attempting an impermissible collateral at-

tack, or "back door appeal," of the permit. On the merits, the Department argues that the Secretary properly classified the modification as a minor, or Class 1, modification. It argues that Southwest Research has misinterpreted the condition as stated in the permit. The Department also contends that the Secretary was not required to hold a public hearing on the modification due to significant public interest.

{19} We hold that under the circumstances of this case, this Court has jurisdiction to resolve the merits of the dispute. We further hold that Southwest Research's appeal of the modification is not an impermissible collateral attack on the final permit. However, we do not believe that the condition adopted by the Secretary in the final permit prohibited the Permittees from placing mixed TRU waste in the same panel as the non-mixed TRU waste deposited in that panel before the permit was issued. Thus, we hold that the modification in the spring of 2000 was a minor, or Class 1, modification. In addition, we hold that the Act did not require the Secretary to hold a public hearing on the modification on grounds of public interest.

**DISCUSSION**

**I.** *This Court Has Jurisdiction to Hear the Merits of This Appeal*

■ {20} The Department argues that this Court lacks jurisdiction over this appeal because Kieling's letter was not the final administrative action. The Department argues that the federal regulation in question allows any person to seek the Secretary's review of a Class 1 modification under 20.4.1.900 NMAC, incorporating 40 C.F.R. § 270.42(a)(1)(iii). Thus, the Department contends that the final agency action was the Secretary's letter of May 10. Because Southwest Research did not file a second notice of appeal after it received the Secretary's letter, the Department contends that this Court lacks jurisdiction to hear the appeal. In support of its position, the Department cites *Harris v. Revenue Division of Taxation Revenue Department*, 105 N.M. 721, 722, 737 P.2d 80, 81 (Ct.App.1987).

{21} We assume, without deciding, that the final agency action in this case was the Secretary's letter to Don Hancock. Thus, we assume that the notice of appeal was filed prematurely. However, we do not agree that the premature filing of a notice of appeal deprives this Court of jurisdiction. On the contrary, Rule 12–201(A) NMRA 2002 provides that a notice of appeal that is filed prematurely "shall be treated as filed after such filing [of the final order] and on the day thereof." Thus, in a previous instance when a notice of appeal was filed before final administrative action, this Court remanded the matter to the administrative agency for a limited period of time, in order to allow the agency to take final action. *Harris*, 105 N.M. at 722–23, 737 P.2d at 81–82. In this case, remand was not necessary because the Department filed the Secretary's letter at the same time it responded to Southwest Research's motion to stay the modification. In addition, Southwest Research filed a docketing statement in this Court within 30 days of the Secretary's letter. See *Marquez v. Gomez*, 111 N.M. 14, 15, 801 P.2d 84, 85 (1990) (construing docketing statement filed with district court clerk as satisfying requirements for notice of appeal). Accordingly, we hold that we have jurisdiction over the merits of the appeal.

■ {22} In a similar vein, the Department argues that Southwest Research cannot now challenge Condition IV.B.2.b because the consequence would be an impermissible reopening of the permit or an impermissible collateral attack on the permit, or because collateral estoppel bars what the Department sees as an attempt to relitigate questions raised and resolved during the permit process. For example, the Department relies on *Costle v. Pacific Legal Foundation*, 445 U.S. 198, 218–19, 100 S.Ct. 1095, 63 L.Ed.2d 329 (1980), which was decided under a somewhat different statutory and regulatory framework, for the common-sense proposition that a party cannot use a modification proceeding to reopen and reargue issues that do not relate to the condition to be modified. However, in this case, the arguments all relate to the permit condition that was modified, and the stipulation of dismissal in the prior appeal expressly allowed Southwest Research to raise these issues.

{23} Similarly, the Department relies on *New Mexico Industrial Energy Consumers v. New Mexico Public Service Commission,* 111 N.M. 622, 808 P.2d 592 (1991), which, in its view, prohibits considering proceedings not appealed in connection with an appeal. We do not agree because Southwest Research appealed the final permit and it was the actions of the Department and the United States that derailed that appeal and led to the present appeal. The Department also argues that agency decisions may, under certain circumstances, be entitled to collateral estoppel effect. *See Shovelin v. Cent. N.M. Elec. Coop., Inc.,* 115 N.M. 293, 297, 850 P.2d 996, 1000 (1993); *Southworth v. Santa Fe Servs., Inc.,* 1998–NMCA–109, ¶¶ 13–18, 125 N.M. 489, 963 P.2d 566. However, Southwest Research is not attacking the Secretary's findings or conclusions, or arguing that the permit, or any portion of it, should be set aside. Thus, there is no need to determine whether this is the type of agency action to which we would apply principles of collateral estoppel.

## II. *The Merits*

■ {24} We turn now to the merits of this appeal. The question before this Court is whether the modification of Condition IV. B.2.b in the spring of 2000 was proper under the applicable statute and regulations. On appeal, this Court may set aside the Department's action only if it determines the action was (1) arbitrary, capricious, or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law. Section 74–4–14(C). Southwest Research contends that the Secretary's treatment of the modification violated the Act and applicable regulations. The meaning of a statute is an issue of law that is reviewed de novo on appeal. *State v. Rowell* 121 N.M. 111, 114, 908 P.2d 1379, 1382 (1995).

{25} The permit in this case was issued pursuant to the Act. The Act also contemplates that permits may be modified. Section 74–4–4.2(D). The Act refers to two categories of modification: minor and major. Sections 74–4–4.2(H) and (J). The Act does not define minor and major modifications.

Instead, it gives the Environmental Improvement Board (the Board) the power to adopt regulations defining minor and major modifications. Section 74–4–4(A)(8). The Act also provides that major modifications to a permit may only be made after "an opportunity for a public hearing at which all interested persons shall be given a reasonable chance to submit data, views or arguments orally or in writing and to examine witnesses testifying at the hearing." Section 74–4–4.2(H). By contrast, a minor permit modification requires a public hearing only "if the secretary determines that there is significant public interest in the minor modification." Section 74–4–4.2(I).

{26} Pursuant to its authority under the Act, the Board adopted 20.4.1.900 NMAC, which, in essence, adopted 40 CFR Part 270. Permit modifications at the request of the Permittees are addressed by 40 C.F.R. § 270.42. That regulation breaks modifications into three different categories: Class 1, Class 2, and Class 3.

{27} Only Class 1 modifications do not require advance notice and public input. Class 1 modifications apply to minor changes that keep the permit current with routine changes to the facility or its operation. 40 C.F.R. § 270.42(d)(2)(i). They do not substantially alter the permit conditions or reduce the capacity of the facility to protect human health or the environment. *Id.* Examples of Class 1 modifications include administrative or informational changes and correction of typographical errors. *See* 40 C.F.R. § 270.42 app. 1 (listing types of modifications and their class).

{28} Our determination of the type of modification at issue here therefore depends on the meaning of Condition IV.B.2.b as adopted by the Secretary in his final order of October 1999. If the Secretary merely clarified the condition and did not change it, the modification was administrative or informational, and it was therefore minor under the Act and the applicable regulations.

{29} Southwest Research makes one main argument with several subsidiary parts to support its contention that the change was major. The main argument relies on the plain language of the condition read in isolation from other parts of the October 1999 order.

We initially resolve the subsidiary arguments.

{30} First, Southwest Research contends that its reading of the plain language is supported by the hearing officer's intent as expressed in his report. Regardless of what the hearing officer may have recommended or what he intended, this appeal is reviewing the Secretary's action. As Southwest Research recognizes in its brief, the Secretary has discretion to review and change the recommendations of the hearing officer. 20 NMAC, § 1.4.V.504(B) (1997). Although he adopted most of the hearing officer's decision, the Secretary changed the specific condition at issue in his final decision after receiving comments on whether the second sentence was to apply to waste disposed of prior to permit issuance. It is the Secretary's final order and condition that is the focus of this appeal. Southwest Research has not argued that the Secretary erred in adopting the condition he did even though the hearing officer may have recommended something else. In addition, we believe that the Secretary's decision was consistent with the hearing officer's recommendation regarding the condition, which was primarily designed to require the characterization of non-mixed waste. We note that non-mixed waste is now required to be characterized solely because the Permittees accepted the condition.

{31} Second, Southwest Research argues that its reading of the condition is supported by the Permittees' actions: the Permittees waited until the Secretary modified the permit and this Court denied a stay of the modification to place mixed TRU waste in the panel containing non-mixed TRU waste deposited there prior to the permit's effective date. Southwest Research also maintains that DOE agreed with its reading of the condition because DOE asked the Secretary to modify the language and asserted· in the prior appeal that the condition means exactly what Southwest Research now argues it means. We view the Permittees' actions and their reading of the condition in the prior appeal as nothing more than an abundance of caution given that the Secretary's actual language in the condition did not appear to conform to his stated intent in the final order adopting the condition. The permit allowed the opening of a major storage facility for dangerous waste. The Permittees quite reasonably did not want to risk that their actions would result in violations, potential lawsuits, and civil and criminal penalties. In formulating their docketing statement in the prior appeal, they appear to have overstated or taken extreme positions in characterizing all of the Secretary's challenged actions, a common litigation tactic. That appeal, however, was dismissed. Moreover, the Permittees' position in that appeal, taken against the Department, should not be binding on the Department in this appeal. *See Johnson v. Yates Petroleum Corp.,* 1999–NMCA–066, ¶ 22, 127 N.M. 355, 981 P.2d 288 (indicating that judicial estoppel applies to one party taking inconsistent positions).

{32} We turn now to the crux of this appeal, which is the actual language of the condition. We must acknowledge at the outset that the condition adopted in the final order, read in isolation, does exactly what Southwest Research says that it does, i.e., the first sentence prohibits the disposal of uncharacterized non-mixed waste, but only after the permit becomes effective, and the second sentence prohibits the disposal of mixed waste at any time in any underground unit that contains uncharacterized non-mixed waste. Grammatically speaking, the introductory clause would apply to the action of disposing, and not to what is already contained in the panel.

{33} Southwest Research relies on rules of statutory construction to ascertain the meaning of the condition in the final permit. *See Johnson v. N.M. Oil Conservation Comm'n,* 1999–NMSC–021, ¶ 27, 127 N.M. 120, 978 P.2d 327 (holding that canons of construction that apply to statutes also apply to interpretation of agency rules and regulations). In particular, apart from grammar, Southwest Research contends that, unless the second sentence is read to prohibit the Permittees from disposing of mixed waste in the same panel as the waste already disposed prior to the issuance of the permit, there would be no point to the second sentence. *See Whitely v. N.M. State Pers. Bd.,* 115 N.M. 308, 311, 850

P.2d 1011, 1014 (1993) (stating that statutes should not be construed to render parts of them surplusage). However, we view Southwest Research's focus on the allegedly plain words of the permit condition and this rule of construction to be entirely too narrow in the context of this case.

■ {34} Our Supreme Court has cautioned against reading statutes too literally in words that are relevant here. In *State ex rel. Helman v. Gallegos,* 117 N.M. 346, 353, 871 P.2d 1352, 1359 (1994), the Court said:

> While ... one part of the statute may appear absolutely clear and certain to the point of mathematical precision, lurking ... in the history and background of the legislation, or in an apparent conflict between the statutory wording and the overall legislative intent, there may be ... genuine uncertainty as to what the legislature was trying to accomplish. In such a case, it is part of the essence of judicial responsibility to search for and effectuate the legislative intent—the purpose or object—underlying the statute.

The most cardinal rule of statutory construction is, of course, to ascertain legislative intent. *State ex rel. Dep't of Pub. Safety v. One 1990 Chevrolet Pickup,* 115 N.M. 644, 647, 857 P.2d 44, 47 (Ct.App.1993).

{35} In this case, it is the intent of the Secretary rather than that of the legislature that is at issue. As in *Helman,* 117 N.M. at 355, 871 P.2d at 1361, we are fortunate in this case that a statement of the Secretary's intent was issued contemporaneously with his formulation of the condition in the final permit. That statement indicates that the Secretary intended both clauses of the condition to apply only after the permit becomes effective.

■ {36} This case, like *Helman,* involves an apparent drafting error. *See id.* at 357, 871 P.2d at 1361. Much of Southwest Research's argument is premised on the notion that there could not be an error in drafting that would so drastically change the meaning of what was intended. We disagree. Although the Permittees proposed language for the modification prior to the Secretary's final order, it is easy to understand why he may

have adopted more streamlined language instead. The proposed condition consisted of two sentences at the time of the Secretary's actions. The hearing officer had recommended that the Secretary insert "after this permit becomes effective" before the first sentence. In rejecting the Permittees' suggested language for the second sentence, the Secretary combined the sentences, obviously intending the preface to apply to both. The Secretary's intent is obvious because he expressly stated it in his contemporaneous order. Indeed, the Secretary's May 10th letter to Mr. Hancock confirms as much. In addition, the Department did not think any language change was necessary because its position all along was that nothing in the permit could be binding until the permit was issued, i.e., the permit operated purely prospectively and no language was necessary to state this. Thus, repeating "after the permit becomes effective" in the second clause, in conformance with the Secretary's intent, was a minor modification or an administrative change.

■ {37} We cannot say that the Secretary abused his discretion or acted contrary to law in making this determination. In so ruling, we acknowledge the purpose of the requirement that the Secretary hold a hearing when he makes non-minor modifications. The hearing requirement is central to the Act. *See* § 74–4–4.2(H); *see also Joab, Inc. v. Espinosa,* 116 N.M. 554, 558, 865 P.2d 1198, 1202 (Ct.App.1993) (recognizing the importance of public input to the Environment Department's decision to issue a permit under the Solid Waste Act). We do not believe that the Secretary overlooked the hearing requirement in this case. The Permittees announced their intention to dispose of non-mixed waste prior to the permit's issuance long before the month-long hearing in 1999. During the pendency of the hearing, the State of New Mexico lost its federal case seeking to prohibit such disposal. The hearing officer devoted much of his decision to the condition at issue, which was originally proposed in response to the announcement that non-mixed waste would be disposed prior to the permit's issuance. There was no shortage of opportunity for public comment

and input on the matters relating to the condition.

{38} In addition, the hearing officer stated that the "relatively small volume of TRU non-mixed waste disposed prior to issuance of the final permit, apparently characterized in substantially the same manner as if TRU mixed waste, should pose no risk to public health or the environment." This statement gave the Secretary a sound basis to conclude that he was not endangering the public health or the environment. We recognize that the parties disagree about the meaning of the hearing officer's next sentence in his narrative, that mixed waste may not be disposed in a unit containing uncharacterized non-mixed waste. However, we are unwilling to give controlling effect to that sentence because we do not know whether the hearing officer intended to refer to waste characterized in substantially the same manner when he said uncharacterized non-mixed waste, and we do know that he deemed the amount of pre-permit waste to be insignificant. In conclusion, we are satisfied that the Secretary and Department have acted in good faith to protect the public, as required by law, and have not changed their minds about the substance of Condition IV.B.2.b of the final permit.

■ {39} Finally, Southwest Research argues that the Secretary was required to hold a public hearing on the minor modification because there was "significant public interest" in the modification. To support its position, it has moved to supplement the record with various statements created after the action being appealed. We deny the motion to supplement. We also hold that the Secretary's determination in this respect is reviewable only for abuse of discretion. *See Borg–Warner Corp. v. Mauzy*, 100 Ill.App.3d 862, 56 Ill.Dec. 335, 427 N.E.2d 415, 419 (1981). The Secretary must decide whether to hold a hearing on a minor permit modification based on whether "there is significant public interest in the minor modification." Section 74–4-4.2(I). Having determined that the modification was to correct an error and conform to his original intent, we cannot say that the Secretary abused his discretion in failing to hold a hearing. The fact that there is great public interest in the WIPP facility in general, the original granting of the permit, or various bigger changes that have taken or will take place does not mean that there must be a hearing for every administrative detail concerning the facility.

{40} We appreciate Southwest Research's argument that public participation is critical to decision-making processes under the Act. However, as we alluded to earlier, there was abundant public participation in the proceedings leading up to the permit. Because the modification was to conform to the original intent and the permit, accordingly, never changed, there would be no point to holding a hearing.

## CONCLUSION

{41} The decision of the Secretary is affirmed.

{42} **IT IS SO ORDERED.**

I CONCUR: LYNN PICKARD, Judge.

JAMES J. WECHSLER, Judge
(concurring in part and dissenting in part).

WECHSLER, Judge (concurring in part and dissenting in part).

{43} I agree that this Court has jurisdiction to address the merits of this appeal. However, because I do not believe that the Act contemplates the type of modification to the permit made by the Secretary without a public hearing, I respectfully dissent.

{44} I too believe that the history of the proceedings is relevant to the determination of this appeal. Although we are concerned with the decision of the Secretary to modify a condition of the permit, the Secretary's final order adopting the permit was the result of lengthy public hearings which resulted in recommended findings of fact and conclusions of law of the hearing officer. In his final order, the Secretary revised the condition, but adopted all of the hearing officer's findings of fact and the rest of the hearing officer's conclusions of law without change. We have previously emphasized the importance of findings of fact made by a hearing officer in a complex case such as this one. *Atlixco Coalition v. Maggiore*, 1998–NMCA–134, ¶¶ 22–24, 125 N.M. 786, 965 P.2d 370.

{45} The hearing officer found that until May 1998, DOE had committed to managing all waste disposed at WIPP as though it was hazardous waste under the Act. Thus, until May 1998, DOE had agreed to subject non-mixed TRU waste (radioactive waste), to the characterization process. The hearing officer also found as fact that "[t]he disposal of significant quantities of waste that has not been characterized in accordance with the [Waste Analysis Plan] poses a direct threat to human health and the environment. Indeed, waste characterization is 'the linchpin' of the [Hazardous Waste Act]...." The findings indicate that the lack of characterization would create a number of problems, particularly with respect to the presence of Volatile Organic Compounds (VOCs), some of which are carcinogenic.

{46} In his narrative discussion, the hearing officer addressed DOE's argument that the Department could not, as a matter of law, impose Condition IV.B.2.b. In addition, the hearing officer stated that:

> Finally, the relatively small volume of TRU non-mixed waste disposed prior to issuance of the final permit, apparently characterized in substantially the same manner as if TRU mixed waste, should pose no risk to public health or the environment. And, of course, Applicants could not dispose TRU mixed waste in any Underground HWDU if the Underground HWDU already contains TRU non-mixed waste *not* characterized in accordance with the WAP.

The Department emphasizes the first sentence, while Southwest Research emphasizes the second. At oral argument, Southwest Research contended that the first sentence had to be understood in the context of the proceedings taking place at the time. A number of groups involved in the hearing had argued that the hearing officer should deny the permit entirely because the disposal of waste that was not fully characterized was a substantial modification for which the public had not been given appropriate notice. Also at oral argument, the Department indicated that there had been testimony about what has been referred to as waste stream "TA 55–43, Lot No. 01" from Los Alamos

National Laboratory. This is the same waste stream that was allowed into WIPP as a result of the federal court decision in March 1999. *See Richardson*, 39 F.Supp.2d at 49. The Department emphasized that, with the exception of this shipment, WIPP did not begin accepting waste until after the Department had concluded its testimony during the public hearing.

{47} I assume that this Court can consider the narrative portion of the hearing officer's report. As elucidated at oral argument, it seems apparent that the statement, which was not carried forward into the findings of fact, was a reference to a particular stream of waste on which the parties had submitted evidence. However, as mentioned in the complaint filed in *United States v. New Mexico Environmental Department*, No. CV–99–1280 (D.N.M. filed Nov. 3, 1999), between the end of the public hearings in March 1999 and the issuance of the Final Permit in October 1999, there were approximately 37 additional shipments of waste to WIPP, including shipments of waste from other sources.

{48} As to the condition at issue in this case, the hearing officer proposed to adopt either the version of the condition proposed by the Department or a substitute version recommended by the hearing officer. The version of the condition proposed by the Department in its proposed findings and conclusions read as follows:

> Specific prohibition—The Permittees shall not dispose non-mixed TRU waste in any Underground HWDU unless such waste is characterized in accordance with the requirements of the WAP specified in Permit Condition II.C.1. The Permittees shall not dispose TRU mixed waste in any Underground HWDU if the Underground HWDU contains non-mixed TRU waste not characterized in accordance with the requirements of the WAP.

The substitute proposed by the hearing officer read as follows:

> Specific prohibition—*after this Permit becomes effective*, the Permittees shall not dispose non-mixed TRU waste in any Underground HWDU unless such waste is characterized in accordance with the requirements of the WAP specified in Permit

Condition II.C.1. The Permittees shall not dispose TRU mixed waste in any Underground HWDU if the Underground HWDU contains non-mixed TRU waste not characterized in accordance with the requirements of the WAP.

The underlined language is the language that the hearing officer proposed to add to the condition.

{49} The second sentence of the condition was adopted by the hearing officer verbatim from the version proposed by the Department. The hearing officer found as fact that the condition was necessary to protect human health and the environment. The sentence of the narrative that might call this finding into question was based on evidence concerning one particular shipment of waste. Giving effect to all the relevant language in the hearing officer's report, I believe it is apparent that the hearing officer adopted the second sentence of the condition at the request of the Department and that the Department and the hearing officer viewed the sentence as prohibiting the disposal of mixed waste (radioactive and hazardous) in any panel that already contained non-mixed (radioactive) waste not characterized in accordance with the Waste Analysis Plan.

{50} Condition IV.B.2.b as adopted by the Secretary in the final order is consistent with these findings of fact, and I have difficulty reading the condition apart from these findings of fact. Indeed, the Secretary intended that both clauses of the condition apply only after the permit became effective. When I read the findings of fact that the Secretary adopted, however, I do not see the same clear intent that the majority attributes to the Secretary. The findings of fact indicate an interpretation of the condition that after the permit was issued, mixed waste could not be disposed in the same panel as non-mixed (radioactive) waste which had not been characterized in accordance with the waste analysis plan. Otherwise, the characterization process would not have operative effect.

{51} I agree that the Secretary intended at the time of the final order that the introductory clause "after this permit becomes effective" would apply to both clauses of the condition. But, even with this reading, the findings of fact adopted by the Secretary support the conclusion that the uncharacterized, non-mixed waste referred to in the second clause refers to waste already disposed in "any underground HWDU." This reading is grammatically correct in that the introductory clause "[a]fter this permit becomes effective," relates to both clauses (1) and (2), stating the starting point at which the Permittees were prohibited from disposing waste in ways addressed by the permit. The introductory clause modifies the verb "dispose" within the words "shall not dispose" in both clauses. It does not relate to the dependent clause that follows or modify "non-mixed TRU waste," the waste already contained in the underground HWDU, the result accomplished by the modification. See William A. Sabin, The Gregg Reference Manual 516–17 (8th ed.1996) (explaining that an adverbial clause functions as an adverb to the main, independent clause and may modify a verb, adverb, or adjective, but not a noun); *State v. Johnson,* 2001–NMSC–001, ¶ 13, 130 N.M. 6, 15 P.3d 1233 (applying rules of grammar to statutory construction); *Rummel v. Lexington Ins. Co.,* 1997–NMSC–041, ¶¶ 26–28, 123 N.M. 752, 945 P.2d 970 (valuing grammatical correctness and the ability to interpret language based on rules of grammar).

{52} Moreover, as Southwest Research argues, the Department's reading of the second clause removes any meaning from the clause because the Permittees could not dispose non-mixed waste which was not characterized after the permit became effective by operation of the first clause. Given the magnitude of this case, I have difficulty believing that the Secretary would adopt meaningless and ungrammatical language in his final order.

{53} Indeed, the Secretary had the opportunity to adopt the language of the modification in adopting the final order. The modification revised the condition to read:

*Specific prohibition*—[A]fter this [p]ermit becomes effective, (1) the Permittees shall not dispose non-mixed TRU waste in any [u]nderground HWDU unless such waste is characterized in accordance with the requirements of the WAP specified in Permit Condition II.C.1, and (2).the The Permittees shall not dispose TRU mixed waste in

any [u]nderground HWDU if the [u]nderground HWDU contains non-mixed TRU waste <u>which was disposed of after this permit became effective and</u> was not characterized in accordance with the requirements of the WAP. (Emphasis added.)

The underlined language was added and the stricken language deleted. When the Secretary reopened the record, DOE asked the Secretary to revise the second sentence of the condition to read:

The Permittees shall not dispose TRU mixed waste in any Underground HWDU if the Underground HWDU contains non-mixed TRU <u>waste which was disposed of after this permit became effective and</u> was not characterized in accordance with the requirements of the WAP. (Emphasis added.)

The Permittees expressed concerns that without the underlined language, they "could be required to suspend disposal operations at WIPP for several months until Panel 2 is ready for waste." By contrast, Southwest Research took the position that the Secretary had the authority to impose any conditions necessary to protect public health and the environment. In addition, it argued precisely the interpretation of the second sentence that DOE wished to avoid—that once the permit was issued, the second sentence would prohibit the disposal of mixed waste in any HWDU (panel) that already contained non-mixed (radioactive) waste that had not been characterized in accordance with the permit. The Department's position was that the second sentence could not as a matter of law apply to waste disposed at WIPP before the Final Permit was issued. The Department recommended the language of the condition as adopted by the Secretary. The Secretary did not adopt DOE's proposed language.

{54} The Department also argues on appeal that language in the Secretary's final order explains the reasons that he adopted the particular language of the condition. This explanation reads as follows:

The Permit Applicants have expressed concern that Permit Condition IV.B.2.b will apply to waste disposed of at WIPP prior to the HWA Permit becoming effec-

tive. Permit Applicants are concerned that they will be subject to enforcement because they have already disposed of waste not characterized in accordance with the WAP. *Furthermore, Permit Applicants are concerned that they will not be able to dispose of additional waste in panel 1 after the HWA Permit becomes effective, because there is already waste in panel 1 not characterized in accordance with the WAP.*

These concerns *are misplaced.* The terms of the HWA permit only apply after the permit becomes effective. [The Department] does not intend that the permit condition apply to the pre-permit period. *See* [the Department's] Comments to Hearing Officer's Report at 13–15.

[The Department] testimony on the permit condition was [given] prior to the ruling in *New Mexico ex rel. Madrid v. Richardson,* ... giving interim status to WIPP. (Emphasis added.)

The Department views this language as indicating that the Secretary did not intend to adopt a version of the condition that would, in effect, prohibit disposing of all waste in Panel 1 because that panel already contained waste not characterized in accordance with the waste analysis plan. However, the condition does not regulate waste disposed during the pre-permit period. Nor does it prohibit the disposal of all waste in a panel that contains waste that has not been properly characterized. Instead, it only prohibits the disposal of mixed waste in such a panel.

{55} Thus, it is not as clear to me as it is to the majority that the Secretary made a mistake in his choice of language. However, even if there was a mistake, I do not believe the modification made by the Secretary can be fairly characterized as a minor or Class 1 modification as defined in the regulations given the lack of consistency with the hearing officer's findings of fact which were adopted by the Secretary, the language of the condition, and the record available to this Court in this case.

{56} Class 1 modifications are relatively minor matters. The regulations define them as follows:

Class 1 modifications apply to minor changes that keep the permit current with

routine changes to the facility or its operation. These changes do [not] substantially alter the permit conditions or reduce the capacity of the facility to protect human health or the environment.

40 C.F.R. § 270.42(d)(2)(i). Appendix I to 40 C.F.R. § 270.42 lists an administrative or informational change as a Class 1 modification, and also lists within the same definition: correction of typographical errors; equipment replacement or upgrading with functionally equivalent components; increases (but not decreases) in the frequency of monitoring, reporting, sampling, or maintenance activities; and changes to remove permanent conditions that are no longer applicable because the standards upon which they are based are no longer applicable to the facility.

{57} When I read this listing as stated in Appendix I in connection with the definition of a minor change as one intended to maintain the permit current "with routine changes to the facility or its operation," I do not believe that the modification in this case fits within the regulatory intent of a minor modification. The Secretary's modification was not intended to respond to a routine change at the facility or its operation. 40 C.F.R. § 270.42(d)(2)(i). Rather, it directly affected the manner in which the Permittees handled the principal operations at the facility. I agree that the Permittees should have acted cautiously before they acted contrary to the language of the condition as set forth in the final order. However, even if it contained ambiguity, it stated a required course of conduct until clarified. Because a clarification in favor of the Permittees would alter the manner of waste disposal, such clarification would "alter" the operation of the facility such that it would be a Class 3 modification under the regulations. See 40 C.F.R. § 270.42(d)(2)(iii). The Secretary had the authority to modify the permit to make such a clarification, but I believe that the Act and regulations require a public hearing before he could take such action.

{58} Accordingly, I would set aside the modification of the permit.